IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VIRGINIA BORHI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No.: 22-cv-3081 |
| | : | |
| TSAROUHIS LAW GROUP, LLC, | : | |
| Defendant. | : | |

## MEMORANDUM

SITARSKI, M.J.                                                                November 13, 2025

This employment discrimination case arises from Virginia Borhi's ("Plaintiff")

employment with Tsarouhis Law Group, LLC ("Defendant" or "TLG"). Plaintiff began working

for Defendant on October 13, 2020, and was terminated on October 21, 2020. Plaintiff

subsequently filed this employment discrimination suit against Defendant on August 4, 2022,

alleging that Defendant unlawfully terminated her employment in violation of both the

Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act

("PHRA"). (Compl., ECF No. 1).

Presently pending before the Court[1] are Defendant's motion for summary judgment

(Def.'s Mot. Summ. J., ECF No. 42), as well as Plaintiff's Response (Pl.'s Resp., ECF No. 47).

For the reasons that follow, Defendant's motion for summary judgment shall be **DENIED.**

## I.       FACTS AND PROCEDURAL BACKGROUND[2]

---

[1] The parties to this action consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). (Consent, ECF No. 13).

[2] As required at this stage of the proceeding, the Court views the evidence in the light most favorable to Plaintiff as the non-moving party. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

### A.    Borhi's Diagnosis and Treatment for Anxiety and Depression

At her deposition on October 26, 2023, Plaintiff testified that she was diagnosed with general anxiety disorder and depression sometime in or around 2009. (*See* Dep. of Virginia Borhi, October 26, 2023, ECF No. 47-2, at 23-24 (hereinafter "Borhi Dep."); *see also* Psychiatric Evaluation of Virginia Borhi, March 16, 2021, ECF No. 47-11 (hereinafter "Borhi Psych. Eval.") (noting that Borhi has a history of anxiety and depression since approximately 2006)). At that time, Plaintiff began participating in counseling and taking prescription medication as treatment for her medical conditions. (Borhi Dep., ECF No. 47-2, at 24-26). In the years following her diagnosis, Plaintiff has consistently received treatment in the form of counseling, prescription medication, and inpatient therapy. (*Id.* at 27-29, 34). Plaintiff noted in her deposition that her anxiety and depression are "not managed," and that when she is "at a job and [she doesn't] understand something," she experiences "panic attacks." (*Id.* at 35).

Based on her condition, Plaintiff applied for social security disability benefits in 2009. (*Id.*). However, according to Plaintiff, the administrative judge at the time determined that Plaintiff "wasn't involved enough in a program," and therefore denied her application. (*Id.*). Plaintiff recently applied for disability benefits with the Commonwealth of Pennsylvania in 2023 but was again denied. (*Id.* at 36).

### B.    Borhi's Employment with TLG

Prior to her employment with Defendant, Plaintiff worked as a legal advocate for a legal services organization, and then as a legal assistant for a private law firm. (Borhi Dep., ECF No. 47-2, at 16-18; Resume of Virginia S. Borhi, ECF No. 47-7). On October 7, 2020, Plaintiff viewed a Craigslist advertisement for a legal assistant position with Defendant—a private law

firm founded by Demetrios Tsarouhis[3]—and applied for the position.  (Borhi Dep., ECF No. 47-2, at 18).  She was interviewed by Tsarouhis on October 8, 2020, after which she was offered the position.  (*Id.* at 19; Dep. of Demetrios Tsarouhis, October 26, 2023, ECF No 47-3, at 10-12 (hereinafter "Tsarouhis Dep.")).  Defendant employed Plaintiff as a legal assistant from October 13, 2020, to October 21, 2020.  (Def.'s Mot. Summ. J., ECF No. 42, at 4) (noting that Plaintiff's record of employment with TLG is "undisputed").

Plaintiff testified that as of October 13, 2020—her first day of work with Defendant—she was taking Lexapro for her anxiety and depression.  (Borhi Dep., ECF No. 47-2, at 37).  However, she could not recall whether she was actively treating with any mental health providers at that time.  (*Id.*).

She stated that when she first arrived, she spoke with Tsarouhis and let him know that she had anxiety and that, based on her condition, she "needed some time to learn the position."  (*Id.* at 39).  She did not provide any documentation of her diagnosis, however.  (*Id.*).

Thereafter, Plaintiff met with and was trained by Jennifer Getz, a legal assistant already employed by Defendant.  (*Id.*).  Plaintiff continued to train with Getz over the course of the next several days.  (*Id.* at 44-46).  On October 19, 2020, less than one week after Plaintiff began her employment with Defendant, Tsarouhis "accosted" Plaintiff in a common area in an "aggressive tone," stating that Plaintiff "need[ed] to learn the job quicker" because TLG was "a fast-paced environment."  (Compl., ECF No. 1, at ¶ 13; *see also* Borhi Dep., ECF No. 47-2, at 47-50).  Tsarouhis continued by asking Plaintiff: "How long is it going to take you to learn?"  (Compl., ECF No. 1, at ¶ 13).  According to her complaint, "Tsarouhis's conduct caused Plaintiff[]

---

[3] Defendant is a private law firm which primarily handles commercial litigation, consumer and retail litigation, and subrogation matters.  (Tsarouhis Dep., ECF No 47-3, at 6).  Tsarouhis founded TLG in 2011 after formerly working as an attorney for several private law firms.  (*Id.* at 6-8).

extreme embarrassment, as his criticism occurred in the presence of her colleagues." (*Id.*). After the incident, Plaintiff "had trouble focusing," though was able to stay at work for the remainder of the workday. (Borhi Dep., ECF No. 47-2, at 51).

Two days later, Tsarouhis again "belligerent[ly]" confronted Plaintiff in the same common area. (*Id.* at 54). Plaintiff was sitting at her desk in a shared area when Tsarouhis appeared and demanded to know who had completed a particular work assignment— "reinstatements."[4] (*Id.*). When Plaintiff admitted that she had been the one who had worked on the reinstatements, Tsarouhis yelled at her, letting her know that she had completed the reinstatements "all wrong" and that she would have to redo everything. (*Id.*). Tsarouhis then told Plaintiff that he would show her how to properly complete the reinstatements himself. (*Id.*). At that point, Plaintiff testified that "it was all a jumble," she was starting to have panic attacks, she was "overwhelmed," and she began to "blackout." (*Id.* at 54-55).

Nevertheless, Plaintiff went to Tsarouhis's office so that he could teach her how to complete the reinstatements. (Compl., ECF No. 1, at ¶ 15). "Tsarouhis continued to speak to Plaintiff[] in a hostile manner and prohibited Plaintiff[] from viewing his computer monitor, thereby preventing her from learning how to properly file the documents." (*Id.*). When Plaintiff "explained that she did not understand what he was doing, Tsarouhis angrily threw his hands in the air and criticized Plaintiff[] loudly enough that her colleagues could hear him through the door." (*Id.*). According to Plaintiff, Tsarouhis's conduct "[c]aused [her] to suffer exacerbated symptoms of anxiety in connection with her disability." (*Id.* at ¶ 16).

Plaintiff thereafter sought additional help from another co-worker, Gina Schembari. (Borhi Dep., ECF No. 47-2, at 56). However, when Schembari attempted to help Plaintiff,

---

[4] According to Tsarouhis and other TLG staff members, reinstatements are a simple task involving the entry of data into TLG's data tracking system. (Tsarouhis Dep., ECF No. 47-3, at 14-15).

Tsarouhis "yelled at [Schembari] for helping [Plaintiff] because he wanted to be the one to help [her.]" (*Id.*). Plaintiff testified that it was "the worst day of [her] life." (*Id.* at 57). She experienced stress because she did not know how she was "supposed to learn that way." (*Id.* at 58). Plaintiff was so "completely distraught" and "emotionally upset" that she told Tsarouhis that, notwithstanding the fact that the workday was not over, she needed to go home. (*Id.*). In response, "Tsarouhis accused Plaintiff[] of being unwilling to learn and said, 'if you go home, then stay there.'" (Compl., ECF No. 1, at ¶ 16). Notwithstanding Tsarouhis's ultimatum, Plaintiff left work early. (*Id.*; *see also* Pl.'s Resp., ECF No. 47, at 5 ("As Plaintiff could not medically continue to work that day, she had no choice but to leave, and Defendant terminated her employment for doing so.")).

In his deposition, Tsarouhis relayed a different version of events. According to him, he assigned Plaintiff "the easiest [assignment]" to work on for her first week—"sheriff service forms"—which involved simple data entry, yet she could not grasp the concept. (Tsarouhis Dep., ECF No. 47-3, at 14-15). When he questioned Plaintiff about her difficulty understanding this concept, Plaintiff told him that Getz was not training her properly. (*Id.* at 15). Tsarouhis was skeptical of this, given that Getz had been working with him for several years; however, he attempted to remedy the situation by having Schembari train Plaintiff instead. (*Id.*). The next day, Plaintiff was still struggling with the data entry task, so Tsarouhis again asked her what the issue was. (*Id.*). According to Tsarouhis, Plaintiff "threw [Schembari] under the bus . . . [a]nd said [that Schembari was] not training [Plaintiff] properly." (*Id.*). Thereafter, Tsarouhis determined that it would be best if he trained Plaintiff himself. (*Id.*). He had Plaintiff come to his office where he showed her how to perform the data entry task. (*Id.*). Tsarouhis denied blocking the computer screen from Plaintiff's line of sight, and also denied yelling at her or berating her during Plaintiff's employment with Defendant. (*Id.* at 15-16). Instead, Tsarouhis

testified that Plaintiff "got really frustrated" and "called [him] some names" before stating that "she didn't want to be there" and that she was going home. (*Id.* at 16). In response, Tsarouhis let Plaintiff know that if she went home early that day, he "[could not] use [her.]" (*Id.*). Plaintiff then left the office. (*Id.*). After Plaintiff left early on her last day, Tsarouhis testified that he "took it as she quit." (*Id.* at 29).

When questioned about Plaintiff's purported disability, Tsarouhis testified that she never notified him that she had anxiety or any other type of medical issue. (*Id.* at 18). Tsarouhis also testified that Plaintiff never requested additional time to train. (*Id.*). Moreover, none of his other employees mentioned anything of the sort either. (*Id.* at 25). When asked about the number of employees he employed during the relevant time period, Tsarouhis stated that he believed it was approximately "eight or nine people." (*Id.* at 9).

Getz and Schembari also testified at depositions regarding Plaintiff's employment. Getz testified that she had been working with Tsarouhis for several years. (Dep. of Jennifer Getz, November 27, 2023, ECF No. 47-4, at 6). Getz noted that she was initially responsible for training Plaintiff when she onboarded with TLG. (*Id.* at 9). On the whole, Getz testified that her training of Plaintiff "went pretty well" and that, although Plaintiff did not pick up her training "as fast as other people would . . . it was fine." (*Id.* at 9-10). Getz also testified that Plaintiff never mentioned her medical conditions. (*Id.* at 11). When asked about the number of individuals that Defendant employed during 2020 and 2021, Getz estimated "maybe about 12 employees." (*Id.* at 7).

Schembari testified that she had been an employee for TLG "going on three years" in November of 2023. (Dep. of Gin Schembari, November 27, 2023, ECF No. 47-5, at 6-7) (hereinafter "Schembari Dep."). In November 2023, Schembari testified that Defendant employed approximately 12 individuals. (*Id.* at 7). However, Schembari also testified that, to

her recollection, back in 2020 and 2021 there may have been a few more individuals employed by Defendant, possibly "about 18." (*Id.* at 7-8). Schembari also did not recall Plaintiff ever disclosing any sort of medical condition or disability to her. (*Id.* at 10). Schembari recalled that on Plaintiff's final day at work, she heard Plaintiff say that she did not feel well and needed to go home. (*Id.* at 12-13). In response, Tsarouhis asked Plaintiff "well, do you want to learn or do you want to go home?" (*Id.* at 13). Thereafter, Plaintiff left Tsarouhis's office, muttered a "curse word" at Tsarouhis, came down the stairs, and told Schembari that she had just been fired. (*Id.*). Schembari responded that she did not think Tsarouhis had fired Plaintiff, but that he had simply given her a choice about whether she wanted to learn the position or not. (*Id.*). Plaintiff then left the office. (*Id.*).

### C.    Proceedings in this Court

Plaintiff filed this action on August 4, 2022, advancing claims of employment discrimination under the ADA and PHRA, alleging that Defendant "terminated her employment based on her . . . disabilities and/or record of impairment . . . and in retaliation for requesting reasonable accommodations for her disabilities." (Compl., ECF No. 1, at ¶¶ 17-26). On May 31, 2024, Defendant filed its motion for summary judgment arguing, that: Plaintiff does not have a disability as defined under both the ADA and PHRA; Plaintiff cannot recover under either statute because she failed to notify Defendant of her alleged disabilities; Plaintiff cannot recover under either statute because she voluntarily quit her job; and Defendant is not an "employer" as defined under the ADA because Defendant does not meet the numerosity requirements of that statute. (Def.'s Mot. Summ. J., ECF No. 42). For the following reasons, this Court disagrees.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party. *Id.* It is not the Court's role to weigh the disputed evidence and decide which is more probative or to make credibility determinations. *Id.* at 255. Rather, the Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the Court must accept as true the evidence adduced by the non-moving party, and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 158-59 (1970)).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the non-moving party must come forward with specific facts showing there is a genuine issue for trial. *See, e.g.*, *Anderson*, 477 U.S. at 256-57; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587. The non-moving party thereby must present something more than mere allegations, general denials, vague statements, or suspicions in order to defeat a properly supported motion for summary judgment. *See, e.g.*, *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82 (1967) (per curiam)); *First Nat'l*

8

*Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968).

## III.    DISCUSSION

### A.    The Analytical Framework for Discrimination Cases

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  The PHRA makes it unlawful "[f]or any employer because of the . . . non-job related handicap or disability . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual . . . if the individual . . . is the best able and most competent to perform the services required."  43 P.S. § 955(a).  Plaintiff's discrimination and retaliation claims under these two statutes are both subject to the same analytical framework. *See Bialko v. Quaker Oats Co.*, 434 Fed. App'x 139, 142 n.5 (3d Cir. 2011) ("The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds.") (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)); *see also Oden v. SEPTA*, 671 F. App'x 859, 862 n.4 (3d Cir. 2016) (stating the "same liability standards" are applied to ADA and PHRA claims because the two statutes are "interpreted consistently") (citation omitted).

Both parties agree that Plaintiff's discrimination claims under these two statutes are subject to the three-part burden-shifting framework set out in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) and can therefore be analyzed together.[5]  (Def.'s Mot. Summ. J.,

---

[5] This Court in *Hanafy v. Hill Int'l, Inc.* recently noted that failure to accommodate claims under the ADA and PHRA may not be subject to the *McDonnell Douglas* burden-shifting framework.  669 F. Supp. 3d 419, 432-33 (2023) (noting that some courts in this jurisdiction and

ECF No. 42; Pl.'s Resp., ECF No. 47, at 7-14). Under that framework, the first step dictates that

Plaintiff bears the burden of making out a *prima facie* case of discrimination. *Burton v. Teleflex*

*Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). "To establish a *prima facie* case at summary judgment,

'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of

[the] *prima facie* case.'" *Id.* (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir.

2001)). If Plaintiff fails to raise a genuine dispute of material fact as to any element of her *prima*

*facie* case, summary judgment in favor of Defendant is warranted. *See Geraci v. Moody-Tottrup,*

*Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996).

Once Plaintiff makes out her *prima facie* case, the burden of production shifts to

Defendant to offer a "legitimate non-discriminatory [justification] for the adverse employment

action." *Burton*, 707 F.3d at 426 (citing *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir.

2009)). If Defendant does so, the third step in the framework "shifts the burden of production

back to the plaintiff to provide evidence from which a factfinder could reasonably infer that

[Defendant's] proffered justification is merely a pretext for discrimination." *Id.* (citing *Fuentes*

*v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)).

Here, Defendant challenges only whether Plaintiff has made out a *prima facie* case of

discrimination. (*See generally* Def.'s Mot. Summ. J., ECF No. 42). Therefore, this Court

analyzes only whether Plaintiff has satisfied her initial burden under the *McDonnell Douglas*

framework. Defendant raises four arguments on brief: (1) Defendant is not an "employer" as

defined under the ADA because Defendant does not meet the numerosity requirements of that

statute; (2) Plaintiff does not have a disability as defined under both the ADA and PHRA; (3)

Plaintiff cannot recover under either statute because she failed to notify Defendant of her alleged

---

others have declined to utilize that analytical framework in accommodation cases).
Nevertheless, as both parties here agree that the *McDonnell Douglas* analytical framework is
appropriate, this Court will deploy this framework in disposing of the instant motion.

disabilities; and (4) Plaintiff cannot recover under either statute because she voluntarily quit her job.  (Def.'s Mot. Summ. J., ECF No. 42, at 3-12).

### B.    The ADA's Numerosity Requirement

As a threshold matter, Defendant argues that neither the ADA nor PHRA applies to it because under the ADA, the term "employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person."  (Def.'s Mot. Summ. J., ECF No. 42, at 11-12 (citing 42 U.S.C. § 12111(5)(A))).  Defendant contends that because it only employed nine individuals during the relevant time period, "the ADA and PHRA do not apply to [Defendant.]"[6]  (Id.).  Defendant cites to Tsarouhis's deposition testimony that he employed between eight and nine individuals during the relevant time, as well as TLG's payroll summary for the six-week period between September 11, 2020, to October 23, 2020, to support the contention that Defendant only employed nine individuals.  (Id.; see also Tsarouhis Law Group, LLC Payroll Summary, ECF No. 47-8).

Defendant's contention ignores competent evidence in the record to the contrary.  The payroll summary that Defendant has provided accounts for only a six-week period during September and November 2020.  However, the relevant test to determine whether an employer is covered under the ADA is whether the employer employed 15 or more individuals "for each working day *in each of 20 or more calendar weeks in the current or preceding calendar year*." 42 U.S.C. § 12111(5)(A) (emphasis added).  Therefore, even were this Court to accept the

---

[6] As Plaintiff points out in her Response, the PHRA contains a numerosity requirement of only four or more employees in order for the provisions of the statute to apply.  43 P.S. § 954(b). Therefore, the terms of the PHRA clearly apply to Defendant, given that Defendant admits that it employed at least nine individuals.  Moreover, as noted *infra*, because this Court determines that there is a genuine question of fact as to whether Defendant in fact employed upwards of 18 individuals during the relevant time period, the distinction in numerosity requirements between the two statutes does not matter for purposes of the instant motion.

payroll summary evidence as definitively proving the number of individuals that Defendant

employed, the payroll summary accounts for only six weeks out of a possible two-year period.  It

is theoretically possible that Defendant may have employed 15 or more individuals for the

requisite 20 weeks during the calendar years of 2020 or 2019.  And in fact, Schembari testified

that it was her recollection that upwards of 18 people worked for TLG during 2020 and 2021.

(Schembari Dep., ECF No. 47-5, at 7-8).  This testimony is sufficient to create a genuine

question as to how many employees Defendant employed during the relevant time period.  *See*

*Anderson*, 477 U.S. at 248 (an issue is "genuine" if there is sufficient evidence from which a

reasonable jury could find in favor of the non-moving party).  Therefore, Defendant's argument

on this point fails.

### C.    Plaintiff's *Prima Facie* Case of Discrimination

Defendant next argues that Plaintiff cannot point to adequate evidence in the record to

prove her *prima facie case* of discrimination.  Defendant challenges whether Plaintiff has a

disability as defined by the ADA and PHRA, whether she gave the requisite notice to Defendant

about any such disability, and whether Plaintiff in fact voluntarily quit her job.

To establish a prima facie case, an employee must establish that she "(1) has a

'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action

because of that disability."[7]  *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir.

2006).  The ADA provides that an individual has a disability if she: (1) has "a physical or mental

impairment that substantially limits one or more major life activities of such individual;" (2) has

"a record of such an impairment"; or (3) is "regarded as having such an impairment."

42 U.S.C. 12102(1).  The ADA was amended by the ADA Amendments Act of 2008

("ADAAA"), in an effort to "promote a less restrictive interpretation of 'disability.'"  *Cohen v.*

---

[7] Defendant does not challenge Plaintiff's qualifications for the position.

*CHLN, Inc.*, 2011 WL 2713737, at *7 (E.D. Pa. July 13, 2011). "In doing so, Congress declared that '[t]he definition of disability shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.'" *Id.* (quoting ADAAA, Pub. L. No. 110–325, § 3(a), 122 Stat. at 3553, 3555 (September 25, 2008) (alteration in original)). Per the EEOC's interpretation of the new standard, the definition of "'substantially limits' is 'not meant to be a demanding standard.'" *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(i) (2011)). The EEOC further found that "whether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" *Id.* (citing 29 C.F.R. § 1630.2(i)(2)). "Rather, 'the determination of whether an impairment substantially limits a major life activity requires an individualized assessment,' and should 'require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.'" *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(iv)). The question of whether an impairment is substantially limiting is an extraordinarily fact-intensive inquiry that must be conducted on an individual basis. *Emory v. Astrazeneca Pharma L.P.*, 401 F.3d 174, 181-82 (3d Cir 2005).

Here, Plaintiff has adduced sufficient evidence that would allow a rational factfinder to conclude that she is substantially limited by her anxiety and depression. She testified that she was diagnosed in 2009 for anxiety and depression, and that her condition prevents her from accomplishing certain work tasks, concentrating, and that when she does not understand something she experiences panic attacks. Though she did not offer any documentation from her diagnosis in 2009, she did complete a psychiatric evaluation on March 16, 2021, with Lesley B. Lewis, D.O., that confirmed her diagnoses for major depressive disorder, anxiety disorder, history of post-traumatic stress disorder, and history of borderline personality disorder. (*See* Borhi Psych. Eval., ECF No. 47-11, at 1-5). Moreover, Plaintiff noted that she has consistently treated with medical professionals and taken medication for her condition since 2009. (Borhi

Dep., ECF No. 47-2, at 23-36).  She maintained at her deposition that her condition precludes her from performing work tasks when she does not understand what is expected of her and does not have time to adequately train.  (*Id.* at 79-80).

"A rational factfinder could reasonably conclude that, when compared to an average individual in the general population, [Plaintiff] is substantially limited in [her] ability to perform [workplace] tasks.  Therefore, [Plaintiff] has established a genuine issue of fact as to [her] entitlement to protection under the ADA" and PHRA.[8]  *Emory*, 401 F.3d at 182.

Defendant's next two contentions simply amount to disagreements about which evidence to credit.  At the summary judgment stage, however, the standard for this Court is clear: it is not the Court's role to weigh the disputed evidence and decide which is more probative or to make credibility determinations.  *Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587-88.  Rather, the Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  *Id.*  If a conflict arises between the evidence presented by both sides, the Court must accept as true the evidence adduced by the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

Here, Defendant contends that Plaintiff never informed any of its employees (including Tsarouhis, himself) of her anxiety.  (Def.'s Mot. Summ. J., ECF No. 42, at 9).  Moreover, Defendant contends that Plaintiff never requested an accommodation for her anxiety.  (*Id.*).  As Defendant notes, in cases alleging a failure to accommodate a purported disability, Plaintiff bears the burden of first proving that she notified Defendant of her disability.  *See Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 325-26 (3d Cir. 2003) ("An employer commits unlawful disability discrimination under the ADA if he/she 'does not mak[e] reasonable accommodations

---

[8] As noted above, the parties treat the analysis under the ADA and PHRA in this case as co-extensive.

14

to the *known* physical or mental limitations of an [employee who is an] otherwise qualified

individual with a disability.'") (alterations in original) (emphasis added) (quoting 42 U.S.C. §

12112(b)(5)(A)); *see also Jones v. United Parcel Service*, 214 F.3d 402, 408 (3d Cir. 2000)

(noting that in order to prevail on a failure to accommodate claim, "a disabled employee must

demonstrate . . . [that] 'the employer knew about the employee's disability . . . [and] the

employee requested accommodations or assistance for his or her disability'").

     Here, Plaintiff directly contradicted Defendant's contention in her deposition testimony,

claiming that she did in fact inform Tsarouhis on her first day of work that she had anxiety that

affected her ability to perform certain work tasks and that she required extra time to train in order

to accommodate her anxiety.  (Borhi Dep., ECF No. 47-2, at 39, 79-80).  This is sufficient to

create a genuine question of a material fact regarding whether Defendant had notice of Plaintiff's

disability.

     To the extent that Defendant argues that Plaintiff failed to provide formal or written

documentation of her disability to Defendant or that Plaintiff did not mention her disability to

other TLG employees, those contentions may affect the weight of Plaintiff's evidence, but they

are not dispositive of Plaintiff's *prima facie* case.  *Cf. Jones*, 214 F.3d at 408 ("[W]hile the

notice [of a desire for an accommodation] does not have to be in writing, be made by the

employee, or formally invoke the magic words 'reasonable accommodation,' the notice

nonetheless must make clear that the employee wants assistance for his or her disability.")

(quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).  As Plaintiff notes,

she alleges that she orally gave notice of her disability to Defendant via her conversation with

Tsarouhis but that Defendant never requested any documentation thereof.  (Pl.'s Resp., ECF No.

47, at 10, 12-13).

Lastly, Defendant contends that Plaintiff voluntarily quit her job on her last day.  (Def.'s Mot. Summ. J., ECF No. 42, at 4-7).  As Defendant notes, one of the elements of a *prima facie* discrimination case is proving that the employee suffered an adverse employment action, such as termination.  *See Yovtcheva v. City of Philadelphia Water Dep't*, 518 F. App'x 116, 123 (3d Cir. 2013).  However, viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could find that Plaintiff requested an accommodation for her disability—taking the rest of the day off in light of her panic attack that she was currently suffering based on Tsarouhis's conduct—and that Defendant (through Tsarouhis) refused, thereafter offering her an ultimatum regarding her continued employment with Defendant: either continue working without her desired accommodations—i.e., taking the rest of the day off and having more time to train—or she would be fired.

Under the ADA, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Such unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  *Id.* at § 12112(b)(5)(A).  Here, a rational factfinder could reasonably find that Defendant's refusal to accommodate Plaintiff constituted discrimination in violation of the ADA and PHRA.

In sum, Plaintiff has adequately supported her *prima facie* case of discrimination based on her disability with sufficient evidence from which a rational factfinder could find for her. Plaintiff therefore has satisfied her initial burden at the summary judgment stage.[9]

---

[9] To the extent that Defendant's motion for summary judgment also challenges Plaintiff's retaliation claims under the ADA and PHRA, Defendant's brief makes clear that the arguments advanced on brief are the same for both Plaintiff's *prima facie* discrimination claims

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is **DENIED**.


BY THE COURT:


_  /s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
United States Magistrate Judge

---

as well as her retaliation claims.  (Def.'s Mot. Summ. J., ECF No. 42, at 8-9).  Therefore, as this Court has already rejected those arguments, any challenge to Plaintiff's retaliation claims also fails.